# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BRANDON WRIGHT[1]                        *
                                          *
    Plaintiff,                           *
                                          *
    v.                                   *
                                          *
KRISTI NOEM,                              *
In her official capacity as               *
Secretary of Homeland Security            *
DEPARTMENT OF HOMELAND                    *
SECURITY                                  *
2707 Martin Luther King, Jr. Avenue, S.E. *
Washington, D.C. 20528                    *     Civil Action No. 26-_____
                                          *
    and                                  *
                                          *
DEPARTMENT OF HOMELAND                    *
SECURITY                                  *
2707 Martin Luther King, Jr. Avenue, S.E. *
Washington, D.C. 20528                    *
                                          *
    and                                  *
                                          *
HEIDI DOE[2]                              *
                                          *
    Defendants.                          *
*    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT
## (Trial By Jury Requested)

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing.

[2] Undersigned counsel are aware of the true name and mailing address of Defendant Heidi Doe by way of separate civil litigation in which she is a named Defendant: Mannina v. O'Keefe Media Group, et al., Civil Action No. 25-01524 (D.D.C.)(APM). That information was provided as part of preliminary discovery and as of the date of this filing remains under seal subject to pending motion practice. Therefore, the information will continue to be treated as such until such time the Honorable Amit Mehta rules otherwise. For now it will be provided to this Court under seal in a separate Notice of Filing.

This civil action exemplifies the reality of the current state of federal governance and the way social media activism is inappropriately, and at times unlawfully, violating the privacy of federal employees and then unduly influencing adverse employment decisions. It is a pattern this current Administration has continued to endorse at an unprecedented level.

Plaintiff Brandon Wright ("Mr. Wright") was a civil servant and employee of the Defendant Department of Homeland Security ("DHS") for eight years prior to the termination of his employment on January 8, 2026. He had been on forced administrative leave from his position as a GS-14 IT Specialist in DHS's Office of the Chief Information Officer ("OCIO") since January 30, 2025. Mr. Wright's employment with the U.S. Government came to an abrupt end due to the "yellow journalism" tactics employed by Defendant Heidi Doe ("Defendant Doe"), who while working for compensation and/or in conjunction with O'Keefe Media Group ("OMG") and James O'Keefe ("Mr. O'Keefe"), fraudulently misrepresented herself and committed tortious acts under federal and local law while, and as a result of, unlawfully filming him during a private date without his consent. The statements made by Mr. Wright during that date, which constituted his own personal opinions and were intended to remain private, were subsequently weaponized by DHS as the primary basis for terminating Mr. Wright's employment.

Mr. Wright is pursuing claims against Defendants Kristi Noem, in her official capacity as Secretary of DHS ("Secretary Noem"), and DHS (herein referred to jointly as "Government Defendants") under the First and Fifth Amendments to the Constitution of the United States, as well as under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. Mr. Wright separately seeks relief against Defendant Doe for fraudulent misrepresentation, conspiracy to commit fraudulent misrepresentation, tortious interference with employment relationship, and violation

of the Federal and District of Columbia ("D.C.") Wire Tap Acts, 18 U.S.C. §§ 2510 et seq. and

D.C. Code §§ 23–542 et seq.

## JURISDICTION

1.   This Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and § 1332(a). With respect to Defendant Doe, the Parties are citizens of different states

and the amount in controversy exceeds $75,000.

2.   This Court exercises personal jurisdiction over this action given that a substantial part (if

not the entirety) of the tortious injuries occurred in the District of Columbia.

## VENUE

3.   Venue is appropriate under 28 U.S.C. § 1391(b)(2) as a substantial part of the events

giving rise to claims occurred in the District of Columbia, as well as under 28 U.S.C. § 1391(e).

## PARTIES

4.   Plaintiff Mr. Wright spent more than a decade supporting the U.S. Government, first as a

private contractor and then, starting in March 2017, as a civil servant. He worked as a federal

liaison between teams that supported modernization efforts for the Homeland Security

Information Network Platform. Mr. Wright earned a Bachelor of Arts degree in Interdisciplinary

Studies from Eastern Washington University, and a Master of Arts degree in International

Studies from the University of Washington. He maintains certifications as a Project Management

Professional and Information Technology Infrastructure Library, version 3. Prior to his

termination from employment, Mr. Wright had an unblemished federal career supporting the

mission priorities and obligations of Administrations of both political parties.

5.   Defendant Secretary Noem is sued in her official capacity.

6. Defendant DHS, headquartered in Washington, D.C., is an agency of the United States. Defendant DHS officials terminated Mr. Wright's employment.

7. Defendant Doe is a natural person residing within the United States. The details of her true name and place of residence are being initially filed under seal with this Court in a separate Notice of Filing in light of a pending Court Order in another matter.

## FACTS

8. Mr. Wright worked faithfully under both Republican and Democratic administrations, including the first Trump administration, which he had no qualms supporting with respect to any assigned missions or responsibilities. In fact, prior to his termination, he never had any previous disciplinary issues or negative reviews. To the contrary, he received performance awards seven years in a row, and in 2024 he was given an on-the-spot case award for his excellent work. He did not have any managerial or supervisory responsibilities over either federal employees or contractors. Nor did he make or implement policy or have interactions with the public as part of his professional work.

### *Bumble Dating App*

9. In January 2025, just like millions of Americans, Mr. Wright began to use dating applications, such as Bumble, to seek a genuine, loving, and lasting relationship that could lead to marriage. Bumble is a dating app that allows users to create individual profiles which its proprietary systems will use to connect potentially suitable users with each other. The system allows users to filter other profiles by location, age, shared interests, and other factors to help ensure profiles are identified that match their personality and values.

10. A user may view other profiles and "swipe" or select on their smartphone a profile that interests them. A prominent feature offered by Bumble, which it uses to distinguish itself from

other dating apps, is that only the female user can then initiate actual contact with a male user. Mr. Wright appreciated this aspect of Bumble's app because he reasonably believed that any woman who reached out would be legitimately interested in him and the type of relationship for which he was looking. The two users can then exchange messages and/or video calls and audio chats within the app, or they can provide personal contact information that allows them to connect directly through other mediums.

11. Bumble offers its app for free, but for an added subscription fee users receive enhanced services. Mr. Wright paid for the Bumble Premium service which included more filtering options, the ability to change your profile location, and greater access to those users who express interest.

12. When signing up with Bumble and in order to utilize the service, a user is required to expressly agree to Bumble's Terms and Conditions of use ("Terms"). For example, users must be over 18 years old, must use their real name and true age for both their account and profile, are not allowed to use another person's Bumble account or to share their Bumble account with any other person without permission and are responsible to ensure that any use of their account complies with all Terms. Notably, users are restricted from using Bumble in a manner that "impersonates or intends to deceive or manipulate a person (including, without limitation, scams and inauthentic behavior)", i.e., users are not permitted to misrepresent their identity.

13. Bumble's Terms require users to also agree to follow its community guidelines, which prohibit "Inauthentic Profiles" and make clear that: "Bumble celebrates authenticity, and we expect all our members to represent themselves accurately on their profile. We don't allow impersonation or misrepresentation on our platform. This includes catfishing (i.e. creating an

5

online persona that isn't you) or falsely stating facts about yourself (including name, gender, age, and permanent location)."

14. Bumble's community guidelines also prohibit "Scams and Theft" which includes "any scam or theft activity intended to defraud or manipulate members out of financial or material resources. This includes requesting or seeking financial support, lying about your intentions for financial gain, or faking romantic intentions to deceive members out of financial or material resources."

15. Mr. Wright's profile included several different pictures of himself. He also included information about various hobbies and interests. He did not include any commentary about his political views or thoughts on the political views of others. For his work description, Mr. Wright merely said he was an IT specialist with DHS, but nothing about what he specifically did for the Government. Because of Bumble's Terms, which he knew all users were required to adopt, Mr. Wright trusted that anyone he met on Bumble would be honest and authentic.

### Mr. Wright Connects with "Heidi"

16. In January 2025, Mr. Wright was contacted on Bumble by Defendant Doe, who falsely said her name was "Heidi." The fake profile Defendant Doe created stated she was in "travel mode" and set the District of Colombia as her location, meaning she was allegedly currently living in D.C., but not permanently. "Heidi's" profile included attractive photos of herself, including on a beach in Hawaii. It listed her age as 25 years old, openly identified her political affiliation as a liberal supporting LGBTQ+ rights and feminism, and stated she was seeking both casual dates and potentially a long-term relationship. When she first contacted Mr. Wright, she asked him if he was the "James Bond of IT?", which Mr. Wright took as a funny joke. Based on her profile, Mr. Wright thought she seemed like a good match and agreed to connect further.

17. Mr. Wright and Defendant Doe exchanged messages through both the app and over texts and he then asked to do a video call before meeting with her. His reason for this request was to verify that Defendant Doe was who she portrayed herself to be in the profile images, and to get to know her better before committing to a date. Defendant Doe agreed to the video call, and during it she stated she was a traveling nurse working in Washinton, D.C., and was originally from Hawaii. Defendant Doe also said she was extremely naïve about D.C. and politics and that she was interested in learning about the government from someone who worked in it.

### The Date

18. During the video call Mr. Wright and Defendant Doe agreed to meet in person for a date at a restaurant in D.C. he knew. At the last minute, however, Defendant Doe messaged Mr. Wright and asked if she could be "vulnerable" for that moment and told him she was nervous about meeting. She instead asked to meet a different restaurant that she was more familiar with and they agreed to meet at the D.C. location of Founding Farmers. They met there on January 21, 2025, at approximately 5:30 pm. The date lasted approximately two hours, during which time they ate dinner and each had a couple of cocktails.

19. Defendant Doe was already at the restaurant and seated when Mr. Wright arrived. She was in a booth against one of the walls in the restaurant that had a row of such booths. On the other side of the booths was a long bar with diners seated on chairs. The restaurant was full of patrons and had a lot of ambient noise, with other voices and restaurant noises mixing in to create a constant hum of activity. Due to the nature of the noise and sitting in the booth, Mr. Wright believed that his conversations with Defendant Doe were private and were only between the two of them. He had no expectation that he was being recorded and would never have consented had he been asked.

20. During the date Mr. Wright and Defendant Doe talked about a number of subjects, as you would expect with two people trying to get to know each other on a first date. Many of the subjects were general in nature such as interests and hobbies or their different backgrounds.

21. Throughout the evening, Defendant Doe continually steered the conversation to politics. She wanted to know a lot about how Mr. Wright thought the government worked and learn his personal political views and opinions of political figures. Mr. Wright talked in general terms about his job and serving as a federal employee, but he did not discuss his specific duties in detail. He described his views on working in government bureaucracy and gave his opinions on how the layers of government employment worked, particularly in having career employees adopt issues pushed by the political leadership and their efforts to ensure these policies were implemented reasonably to keep things operating smoothly. He made clear that he viewed his role as a civil servant was different than the roles of political appointees, and he was glad that as a GS-14 there were filters between him and those appointees.

22. At one point, Defendant Doe mentioned she believed Defendant Secretary Noem was "crazy". Mr. Wright told her that he was glad she had read up on Defendant Secretary Noem and he agreed with her interpretation. In fact, Mr. Wright told Defendant Doe that her opinion was a "green light" for him. As a result of her expressed comments about her own political views, which were deliberately false and intentionally designed to extract potentially controversial political responses, Mr. Wright felt more comfortable in privately expressing his personal negative feelings about Defendant Secretary Noem, who at the time was still a non-federal employee pending Senate confirmation. She was not confirmed as the DHS Secretary until four days later on January 25, 2025.

23. Throughout most of the evening Defendant Doe had her cell phone lying face down on the table, though Mr. Wright did not think anything of it at the time. She excused herself at one point towards the end of the date to use the restroom, and when she returned to the table she placed the phone face up and resting against her purse. Defendant Doe again turned to the topic of politics and asked him if there was anything else Mr. Wright wanted to tell her about how he felt about the incoming administration. Because Mr. Wright wanted to talk about other subjects during their date he repeatedly tried to steer the conversation in a different direction. But Defendant Doe kept bringing the conversation back to political subjects. By the end of the date, Mr. Wright had become mildly annoyed with Defendant Doe.

24. The date ended at approximately 7:30 p.m. and Mr. Wright paid for dinner, which was approximately $198.00. Mr. Wright offered to drive Defendant Doe home or to the Metro, but she declined and said she was going to stay at the restaurant a little longer. They said goodbye and the date ended.

25. After the date, Defendant Doe texted Mr. Wright and told him it was a great first date and that they should go out again sometime. Mr. Wright, however, did not feel there was a strong connection and he particularly had not liked Defendant Doe's repeated questions and efforts to talk about D.C. politics. He responded to Defendant Doe that he was not interested in going out again, but offered to still be her friend as she was new in D.C. She replied she understood and wished him luck. He assumed that would be the last time he would hear from her.

### *Dissemination of a Secretly Recorded Video of the Date*

26. On approximately January 29, 2025, Mr. Wright began to receive voicemails from an unknown number that was threatening in nature. Each voicemail seemed to be the same person telling him "You're famous, buddy" and that he would soon lose his job. He also received a text

message from a number he did not recognize with a screenshot from Google Maps of his old home claiming that it was his, that the sender knew he was a DHS employee and a reference to a "honeypot scheme". At that point, Mr. Wright did not know what these messages and voicemails were about. He received similar texts and voice mail messages over the next few days, and he actually changed his phone number to end the harassment. Given that the text messages had referenced his work at DHS, Mr. Wright reported the harassment to his supervisor. He did not hear back from his supervisor or anyone else at DHS about the issue prior to the initiation of disciplinary action.

27. On February 3, 2025, a video (the "Video") that featured numerous interspersed clips of Mr. Wright talking to Defendant Doe, alongside narration by Mr. O'Keefe, the owner and founder of OMG, was posted to various publicly available social media sites such as X,[3] Facebook,[4] Instagram,[5] and YouTube.[6] The same Video, along with an article, was posted to the website for OMG.[7] The Video on X, at the time of this filing, has been viewed more than 2.5 million times, received 31,000 likes, 15,000 reposts, and has over 2,300 comments.

---

[3] *https://x.com/JamesOKeefeIII/status/1886429707387727887?s=20.*

[4] *https://www.facebook.com/share/v/15U5cLBmJm4/.*

[5] *https://www.instagram.com/reel/DFnXFwwMSmO/.*

[6] *https://youtu.be/74UVFZcCXxI?si=IYDwhtkwJ6kN-Xg.*

[7] *https://okeefemediagroup.com/we-dont-let-them-get-in-our-way-gs-14-dhs-official-admits-department-will-defy-trump-appointed-secretary-kristi-noems-marching-orders-reveals-ta/.*



On YouTube, at the time of this filing, the Video has been viewed over 141,000 times and received over 18,000 thumbs up.



28. The Video does not include the entirety of the two-hour date between Mr. Wright and Defendant Doe and is instead approximately thirteen minutes and thirty-four seconds in length. It presents several clips that are repeated more than once and out of context, includes various

narrations and comments inserted by Mr. O'Keefe, and even two ads where Mr. O'Keefe endorses a company investing in gold and another that sells emergency preparedness kits. The video and audio footage were recorded without Mr. Wright's knowledge or consent, apparently though a hidden camera on Defendant Doe's body and a second camera that appears to have been used from a chair across the aisle at the bar. A title screen for the video makes it clear that the purpose of Defendant Doe's fraudulent misrepresentations of herself was to enable her to "Dat[e] the Deep State", whatever that might be, and obtain information about federal employees.



29. After the publication of the Video on social media, Mr. Wright received additional hateful messages through his public LinkedIn account, which forced him to make his profile private.

30. The article that accompanied the Video on the OMG website stated that an official with DHS had been contacted and asked for comment. The article noted that DHS replied: "Secretary Noem has not seen the video in its entirety. This type of behavior will not be tolerated. This person has been placed on leave and is under investigation … The senior official says the

termination of the official is imminent." Upon information and belief, the Video (in whole or in part, as well as other recorded portions from the date) was provided to DHS for comment prior to it being published on the Internet. On X, the video and the article was posted on February 3, 2025, at 10:01 am EDT as part of a thread that included this graphic prominently featuring the DHS statement:



31. This was not the first time Defendant Doe had used dating apps in clear violation of their terms and conditions to arrange dates with individuals whom OMG and O'Keefe sought to target as part of their tortious and unlawful efforts to further their extreme partisan political agenda. In fact, Defendant Doe has fraudulently specifically posed as "Heidi" on other fake dates, one of which is currently the subject of civil litigation in Mannina v. O'Keefe Media Group, et al., Civil Action No. 25-01524 (D.D.C.)(APM).

***Termination Action***

32. DHS placed Mr. Wright on Administrative Leave on January 30, 2025.

33. On April 3, 2025, DHS issued a Proposed Notice of Removal ("Proposal"). The Proposal contained seven Specifications under the Charge of "Conduct Unbecoming of a Federal Employee", all of which referred to Mr. Wright's off-duty private remarks contained in the Video. Each Specification concluded with the following description: "This statement is disrespectful and unprofessional, and unbecoming of a federal employee."

34. The Proposal also contained two Specifications under a charge of "Failure to Follow Policy", referencing allegations that Mr. Wright took a Government-issued phone on international travel and failed to properly report international travel through the DHS Security Reporting Portal.

35. Through counsel, Mr. Wright submitted a detailed written response to the Proposal on April 24, 2025.

36. On January 8, 2026, DHS issued a Notice of Decision on Proposed Removal ("Decision"). In the Decision, DHS concluded that termination of Mr. Wright's employment was warranted. The Decision noted the "unfortunate circumstances" in which Mr. Wright's private, off-duty remarks were secretly recorded, but concluded that his continued employment would "signal to the workforce that it is permissible for employees to undermine the Secretary, the President's and [the deciding official's] agenda and authority." The Decision repeatedly states that DHS cannot take the risk that Mr. Wright might ignore instructions that could go unnoticed, thereby causing untold damage to DHS operations even though there is no evidence that in the eight years Mr. Wright was employed by the Government Defendants, including during the first Trump administration, he ever engaged in any such behavior.

**LEGAL BACKGROUND**

37. Congress enacted the Civil Service Reform Act ("CSRA") in 1978, to create a uniform scheme for administrative and judicial review of covered federal employee personnel actions to ensure a non-political career civil service for the good of the American public. That scheme sets forth protections and remedies available to such employees as well as procedural processes they must follow. 5 U.S.C. § 2301(b).

38. In his role at DHS, Mr. Wright would normally be entitled to statutory protections under the CSRA, which provides that a covered employee against whom an action is proposed is entitled to "at least 30 days' advance written notice," an opportunity to respond orally and in writing, representation, and "a written decision and the specific reasons therefor at the earliest practicable date." Id. at § 7513(b). Decisions are appealable, first to the Merit Systems Protection Board ("MSPB") and then to the Court of Appeals for the Federal Circuit. Id. at §§ 7513(d), 7703(b).

39. The MSPB was designed to be an independent agency consisting of three Members, each appointed by the President with the advice and consent of the Senate. Id. at §§ 1201, 1202(a)-(c). It is a quasi-judicial body that was meant to adjudicate conflicts between civil servants and their employing agencies and designed to specifically resolve disputes including federal employees' allegations that their government employer discriminated against them, retaliated against them for whistleblowing, violated protections for veterans, and/or otherwise subjected them to an unlawful adverse employment action or prohibited personnel practice. Id. at §§ 1204(a)(1), 1221, 2302(b)(1), (8)-(9), 3330a(d), and 7512.

40. By statute, no more than two Members of the MSPB are permitted to be from the same political party, which ensures federal employees are "protected against arbitrary action, personal

favoritism, or coercion for partisan political purposes." Id. at §§ 1201, 2301. MSPB Members notably serve seven-year terms—a term limit longer than that guaranteed to the appointing President. Id. at § 1202(a).

41. As of this filing, there are two Members of the MSPB, Acting Chairman Henry J. Kerner and James. J. Woodruff II, which constitutes a quorum permitting votes on petitions for review. Mr. Kerner and Mr. Woodruff are both Republicans, which requires the third Member to be a Democrat. Mr. Trump has not nominated anyone for the third position.

42. For preservation purposes, Mr. Wright filed an appeal with the MSPB to challenge his termination shortly after this Complaint was filed. No action has occurred.

43. Upon information and belief, MSPB Administrative Judges now lack the ability to issue timely decisions, particularly in light of their exponentially increased and unprecedented caseload. More importantly, the very independence of the MSPB and the practical availability of judicial review in general is now in question. Since the commencement of his second term, Mr. Trump has already removed one Member of the MSPB without cause and has asserted the authority to remove any and all MSPB Administrative Judges without cause as well. The Administration has also expressly claimed authority to dictate to all Executive Branch agencies – including the MSPB – how to construe federal law, particularly with respect to termination decisions. Indeed, this assertion of unprecedented authority has led one Executive Branch agency to inform its administrative judges that they can ignore and defy federal court rulings. Whatever the MSPB is now, it does not reflect the original Congressional intent for how the CSRA was to operate and the extent of its authority.

44. The MSPB cannot independently perform its duties so that the claims of covered employees, such as Mr. Wright, are adequately protected and timely resolved in a manner

16

consistent with the statutory mandates of Congress. The integrity of the CSRA's original Congressional intent is thwarted and this Court therefore may exercise jurisdiction over the presented Constitutional employment challenges to ensure meaningful and practical judicial review, as originally intended by Congress.

**COUNT ONE**
**VIOLATION OF THE FIRST AMENDMENT**
**(Against Government Defendants)**

45. Mr. Wright repeats and realleges the allegations contained in paragraphs 8 through 44, inclusive.

46. The First Amendment to the Constitution guarantees all individuals "the freedom of speech", which includes expression and association. These rights allow government employees to speak on matters of public concern and to third parties without fear of retribution and retaliation.

47. Mr. Wright's intended private expression of his personal opinions, especially during non-duty hours, is quintessential protected speech on a matter of public concern. The Government Defendants retaliated against Mr. Wright because of ordinary private speech and unlawfully removed him from federal service due solely to the expression of his Constitutionally protected freedom of speech.

48. Mr. Wright's protected speech did not take place in a Government facility, use Government equipment, rely upon Government systems or databases or involve Government employees. It did not consist of any non-public information Mr. Wright learned as part of his employment duties. To the contrary, his expressed protected speech, which was never intended to be publicly shared, consisted exclusively of observations about open-source information reported in the news media, as well as his own personal opinions on matters of public concern.

49. Mr. Wright's protected speech had no impact on the work he performed, nor would or could it ever. The administrative record is devoid of evidence indicating the Government Defendants did anything to determine whether Mr. Wright's protected speech actually caused any disruption or hampered his ability to perform his employment responsibilities.

50. The Government Defendants would not have proposed disciplinary action against, much less terminated, Mr. Wright absent his protected speech.

51. Mr. Wright suffered adverse effects including, but not limited to, loss of present employment and jeopardized future opportunities.

**COUNT TWO**
**VIOLATION OF THE FIFTH AMENDMENT**
**(PROPERTY INTEREST)**
**(Against Government Defendants)**

52. Mr. Wright repeats and realleges the allegations contained in paragraphs 8 through 44, inclusive.

53. Under the Fifth Amendment, the government cannot deprive a person of property without due process of law. Mr. Wright maintains a judicially cognizable property interest in his continued employment with DHS.

54. 5 U.S.C. § 7513 guarantees Mr. Wright an appeal of any termination decision, which under normal circumstances would be first heard by the MSPB. The MSPB, however, no longer has the ability to independently perform its statutorily required functions. Mr. Wright is entitled to an objective review of the legal merits of his termination of employment by a functioning judicial body. As the MSPB cannot properly perform that function as designed by Congress, Mr. Wright is entitled to seek alternative judicial relief through the federal district court for the deprivation of his property interests in employment.

55. Mr. Wright suffered adverse effects including, but not limited to, loss of present employment and jeopardized future opportunities.

## COUNT THREE
## DECLARATORY JUDGMENT – 28 U.S.C. §§ 2201 and 2202
### (Against Government Defendants)

56. Mr. Wright repeats and realleges the allegations contained in paragraphs 8 through 44, inclusive.

57. Mr. Wright is entitled to declaratory relief based on all claims identified. There is a substantial, ongoing controversy between Mr. Wright and the Government Defendants, and a declaration of rights under the Declaratory Judgment Act is necessary to establish that the Government Defendants did not properly or reasonably terminate Mr. Wright based on the applicable statutes and regulations.

58. The MSPB no longer has the ability to independently perform its statutorily required functions. Mr. Wright is entitled to an objective review of the legal merits of his termination of employment by a functioning judicial body. As the MSPB cannot properly perform that function as designed by Congress, Mr. Wright is entitled to seek alternative judicial relief through the federal district court for all claims.

59. Mr. Wright suffered adverse effects including, but not limited to, loss of present employment and jeopardized future opportunities.

## COUNT FOUR
## FRAUDULENT MISREPRESENTATION
### (Against Defendant Doe)

60. Mr. Wright repeats and realleges the allegations contained in paragraphs 8 through 36, inclusive.

61. In exchange for payment from, and/or at the behest or instruction of, OMG and Mr. O'Keefe, Defendant Doe deliberately misrepresented herself to Mr. Wright to entrap him into making remarks that could be distorted, exaggerated and/or exploited for harmful, political purposes. Defendant Doe offered up a fake version of herself in the persona of "Heidi" through her Bumble profile, and throughout the course of her interactions prior to and during her date with Mr. Wright, lied to provide a false image of her political views. She deliberately misrepresented her intentions in a fake Bumble profile, which violated the Terms and community guidelines of the dating app by creating an "inauthentic profile." Defendant Doe was uninterested in seeking romantic connections, nor was she personally interested in Mr. Wright. She was part of a targeted operation against individuals, particularly employed by the federal Government, perceived to have certain political views that were not in alignment with OMG and/or Mr. O'Keefe.

62. Defendant Doe's false representations materially induced Mr. Wright to engage with her through the Bumble App, communicate with her about potential dates, agree to go on a date, and elicit discussions about himself in a manner he would not otherwise have done had he known her actual intent. Mr. Wright reasonably relied in good faith upon her deliberate and false misrepresentations.

63. Defendant Doe intentionally deceived Mr. Wright to obtain private information regarding his personal opinions which were then used by OMG and Mr. O'Keefe to construct an inflammatory, false perception of his conduct at work and his compliance with the law.

64. As a natural and proximate consequence of Defendant Doe's fraudulent misrepresentations, Mr. Wright lost his employment with Defendants DHS. Defendant Doe allowed her secret recording of Mr. Wright, made without his consent, to be provided to the

Government and that secret recording served as the proximate cause of his termination, distinct from the publication of the Video itself, and for which Defendant Doe is liable. The private statements Mr. Wright made about his employment were used and directly relied upon by the Government Defendants in their termination decision. Furthermore, Mr. Wright suffered non-reputation damages in the form of out-of-pocket expenses.

## COUNT FIVE
## CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION
### (Against Defendant Doe)

65. Mr. Wright repeats and realleges the allegations contained in paragraphs 8 through 36, inclusive.

66. Defendant Doe conspired with OMG and Mr. O'Keefe to deliberately misrepresent herself to Mr. Wright to entrap him into making inflammatory and damaging remarks to publicly create the false perception that he undermined or intended to undermine lawful DHS operations. Upon information and belief, OMG and Mr. O'Keefe arranged and paid for Defendant Doe to knowingly provide Mr. Wright with false information regarding herself, particularly with respect to her political views. They trained Defendant Doe on how to engage in this form of entrapment and to elicit misleading remarks from an unwitting third party.

67. Defendant Doe knowingly conspired with OMG and Mr. O'Keefe to secretly record her private conversation with Mr. Wright. Their conversation constituted his personal opinions and were absent of any independent newsworthy value, were made without his consent and the selected excerpts were distributed without his authorization.

68. As a natural and proximate consequence of Defendant Doe's fraudulent misrepresentations, and distinct from the publication of the Video itself, Mr. Wright lost his employment with Defendants DHS. Defendant Doe is liable for allowing her secret recording of

Mr. Wright, made without his consent, to be provided to the Government and causing his termination. The private statements Mr. Wright made about his employment were directly used and relied upon by the Government Defendants in their termination decision. Furthermore, Mr. Wright suffered non-reputation damages including out-of-pocket expenses.

**COUNT SIX**
**TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP**
**<u>(Against Defendant Doe)</u>**

69. Mr. Wright repeats and realleges the allegations contained in paragraphs 8 through 36, inclusive.

70. Through actions that deliberately violated the Terms and Conditions of the Bumble app, Defendant Doe obtained access to Mr. Wright's Bumble profile which identified him as an IT specialist working for Defendant DHS. Upon information and belief, Mr. Wright was specifically targeted by Defendant Doe because he identified himself as a federal employee. Prior to and during what Mr. Wright believed was a romantic date, Defendant Doe intentionally confirmed his employment with Defendant DHS.

71. Defendant Doe repeatedly solicited and encouraged Mr. Wright to express any negative opinions about Defendant Secretary Noem and the incoming administration. She intentionally and misleadingly created an environment that caused him to falsely but reasonably believe that she shared his opinions and that she was personally interested in his views. In fact, Defendant Doe did not share Mr. Wright's opinions and instead viewed herself as part of an effort to root out federal employees perceived to be members of the nefarious "Deep State" who were planning to undermine the Trump administration. Defendant Doe provided her recordings, which were made without Mr. Wright's knowledge or consent, to OMG and Mr. O'Keefe and allowed them to be provided to Defendant DHS prior to the publication of the Video on the Internet. The

private statements Mr. Wright made about his employment and personal views specifically concerning Defendant Secretary Noem (who was not yet even confirmed in the position at the time of his protected speech), were relied upon by the Government Defendants and directly caused the termination decision, which was part of Defendant Doe's tortious intent.

72. As a natural and proximate consequence of Defendant Doe's actions, Mr. Wright has suffered actual damages due to his loss of federal employment, as well as out-of-pocket expenses.

**COUNT SEVEN**
**VIOLATION OF 18 U.S.C. § 2511 AND D.C. CODE § 23-542 – WIRE TAP ACTS**
**(Against Defendant Doe)**

73. Mr. Wright repeats and realleges the allegations contained in paragraphs 8 through 36, inclusive.

74. Defendant Doe knowingly and secretly recorded Mr. Wright during the course of their date without his knowledge or consent. Even though the date took place in a public restaurant, Mr. Wright reasonably believed he was having a private conversation with a potential romantic partner and that there existed a legitimate expectation of privacy. Mr. Wright had no reason to believe his private conversation was being secretly recorded or that Defendant Doe was coordinating with a third party to then disseminate his personal opinions without authorization.

75. Notwithstanding the District of Columbia being a one-party consent jurisdiction, Sections 2511 and 23-542 nonetheless prohibit the recording of a communication for the purpose of committing a tortious act.

76. At all times Defendant Doe intended to obtain secret recordings of statements from Mr. Wright by way of fraudulent misrepresentation (and/or conspiracy) and to interfere with his employment, both of which constitute tortious acts. Furthermore, Defendant Doe intended from

the outset to provide the secretly recorded statements to Defendant DHS, an action Defendant

Doe should have reasonably known would, and was intended to, lead to the termination of Mr.

Wright's employment This exception to the "one-party" consent rule is content-neutral and

serves a significant government interest.

77. As a natural and proximate consequence of Defendant Doe's fraudulent

misrepresentations, Mr. Wright lost his employment with Defendants DHS. Defendant Doe

allowed her secret recording of Mr. Wright, made without his consent, to be provided to the

Government and that secret recording served as the proximate cause of his termination, distinct

from the publication of the Video itself, and for which Defendant Doe is liable. The private

statements Mr. Wright made about his employment and personal views specifically concerning

Defendant Secretary Noem (who was not yet even confirmed in the position at the time of his

protected speech), were relied upon by the Government Defendants and directly caused the

termination decision, which was part of Defendant Doe's tortious intent. Furthermore, Mr.

Wright suffered non-reputation damages including incurring out-of-pocket expenses.

**WHEREFORE**, Plaintiff Brandon Wright prays that this Court awards him the following

relief:

(1) A declaration that the Government Defendants' termination of Mr. Wright's employment

was in retaliation for First Amendment-protected speech and that Mr. Wright is entitled to relief;

(2) A declaration that the Government Defendants' actions violated Mr. Wright's Fifth

Amendment due process and statutory rights and that Mr. Wright is entitled to relief;

(3) A declaration that the Merit System Protection Board does not have the independent

ability to adjudicate Mr. Wright's claims pertaining to this employment termination;

(4) An award of backpay and other monetary and administrative relief from the Government

Defendants;

(5) An award of damages against Defendant Doe to be determined at trial, but not less than

$75,000;

(6) An award of costs and attorney's fees as provided in 28 U.S.C. § 2412 (d) and any other

applicable law;

(7) Expedition of this action pursuant to 28 U.S.C. § 1657 (a); and,

(8) A grant of such other relief as the Court may deem just and proper.

Dated: January 18, 2026

Respectfully submitted,

s/ *Mark S. Zaid*

_____

Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Kevin T. Carroll, Esq.
D.C. Bar #1021479
Geoffrey Deweese, Esq.
(*Pro Hac Vice* pending)
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700 – PMB 5287
Washington, D.C. 20036
(202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com
Kevin@MarkZaid.com
Geoffrey@MarkZaid.com

Attorneys for the Plaintiff